Case 2:26-cv-00327-KNS   Document 13-4   Filed 03/09/26   Page 1 of 12

Thogus Products Company v. Bleep, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 5607458
Only the Westlaw citation is currently available.
United States District Court, N.D. Ohio, Eastern Division.

THOGUS PRODUCTS COMPANY,
Plaintiff/Counter-Defendant,
v.
BLEEP, LLC, Defendant/Counter-Claimant.

Case No. 1:20-cv-01887
|
Signed August 30, 2023

**Attorneys and Law Firms**

E. Marquis Young, Roetzel & Andress, Cleveland, OH, for Plaintiff/Counter-Defendant.

Sara Smoter Dorland, Jeffrey S. Dunlap, Ulmer & Berne, Cleveland, OH, for Defendant/Counter-Claimant.

**MEMORANDUM OPINION AND ORDER**

BRIDGET MEEHAN BRENNAN, UNITED STATES DISTRICT JUDGE

**\*1** Before this Court are cross-motions for summary judgment filed by Bleep, LLC ("Bleep") (Doc. No. 50) and Thogus Products Company ("Thogus") (Doc. No. 59). Both motions are fully briefed. (Doc. Nos. 71, 72, 75, 77.) For the reasons that follow, both summary judgment motions are GRANTED in part and DENIED in part.

**I. Background**

**A. Factual Background**

The following is a brief recitation of facts that are both undisputed and pertinent to ruling on the summary judgment motions.

Thogus is a family-owned custom plastic injection molder and contract manufacturer. (Doc. No. 59-1 at 3088.)[1] It is headquartered in Avon Lake, Ohio. (*Id.*) Bleep is a North Carolina limited liability company that develops and sells sleep apnea treatment devices. (Doc. 12 at 254-55.) Bleep developed the DreamWay and DreamPort devices (the "Goods"). (*Id.* at 255.) The Goods worked with continuous positive airway pressure ("CPAP") machines to aid those suffering from sleep apnea. (*Id.*)

With the help of an engineering consultant, Bleep selected Thogus to be the Goods' primary manufacturer. (Doc. No. 61-1 at 3274-75.) In March 2018, the parties formalized their relationship in the Manufacturing Supply Agreement (the "MSA"). (Doc. No. 50-3 at 1012.) The MSA contemplated Bleep submitting purchase orders to Thogus, which request that specific amounts and types of Goods be delivered by a particular time. (*Id.* at 994.) Thogus would then accept or, in limited circumstances, reject these purchase orders. (*Id.*) If accepted, Thogus was obligated to manufacture and ship the Goods. (*Id.* at 994-95.)

In November 2018, Bleep issued Purchase Order 25. (Doc. No. 50-15.) Purchase Order 25 provided that deliveries were to occur on January 22, 2019, February 11, 2019, and March 4, 2019. (*Id.*) However, due to a delay in installing manufacturing equipment at Thogus' facilities, Thogus did not complete the shipment of all Purchase Order 25 Goods until July 31, 2019. (Doc. No. 59-2 at 3093; Doc. No. 59 at 3077.)

On March 1, 2019, Bleep and Thogus executed the Second Amendment to the MSA. (Doc. No. 71-10; Doc. No. 71-11 at 4074.) This Amendment memorialized Bleep's decision to have Thogus stretch a component of the Goods called the Short Hose. (Doc. No. 71-10.) It then provided that Thogus shall have "no liability whatsoever" from this decision. (*Id.*)

Bleep issued Purchase Order 28 on March 11, 2019. (Doc. No. 50-8.) Purchase Order 28 required deliveries in June 2019, July 2019, and August 2019.[2] (*Id.*) Thogus made its first delivery under Purchase Order 28 on August 6, 2019 – two months late. (Doc. No. 75-8.)

**\*2** Beginning in August 2019, Bleep received customer complaints regarding issues with the Goods, including complaints about missing or damaged parts. (Doc. No. 71-1 at 3992; Doc. No. 51.)

In the second week of August 2019, Bleep representatives traveled to Ohio to meet with Thogus representatives. (Doc. No. 59-1 at 3089.) At the meeting, Bleep directed Thogus to immediately cease the shipment and manufacture of all Goods

Case 2:26-cv-00327-KNS    Document 13-4    Filed 03/09/26    Page 2 of 12

Thogus Products Company v. Bleep, LLC, Not Reported in Fed. Supp. (2023)

ordered in Purchase Order 28. (*Id.*) Thogus complied with this directive. (*Id.*)

On July 16, 2020, Thogus demanded payment from Bleep for, among other things, unshipped Goods that were manufactured to fulfill Purchase Order 28. (Doc. No. 71-18.) Bleep notified Thogus that it was cancelling Purchase Order 28 the next day. (Doc. No. 71-20 at 4114.) Bleep also issued Notice of Recall and Warranty Claims on July 20, 2020, and August 25, 2020. (Doc. Nos. 71-21, 71-22.)

### B. Procedural Background

Thogus initiated this action on July 20, 2020. (Doc. No. 1-1 at 7.) Bleep removed the case to this Court on August 25, 2020, pursuant to the Court's diversity jurisdiction. (Doc. No. 1.)

On September 8, 2020, the parties filed a joint motion to stay the case until the parties completed non-binding mediation. (Doc. No. 6.) The Court granted the motion to stay the next day. (9/9/2020 Non-Document Order.)

On December 14, 2020, Thogus filed a motion to amend its complaint *instanter*. (Doc. No. 8.) On December 15, 2020, the Court lifted the stay and granted Plaintiff's motion to amend. (12/15/2020 Non-Document Order; Doc. No. 11.) Plaintiff's amended complaint contains two counts: breach of contract (Count One) and enforcement of lien rights under Ohio law (Count Two). (Doc. No. 8-2.)

Bleep filed its answer and verified counterclaims on December 29, 2020. (Doc. No. 12.) Bleep alleges seven counterclaims: fraud, fraudulent inducement, and promissory fraud (Counterclaim One), breach of the MSA's mandatory mediation provision (Counterclaim Two), breach of the MSA's bailed property return obligations (Counterclaim Three), breach of the MSA's warranty provisions (Counterclaim Four), breach of the MSA's regulatory obligations (Counterclaim Five), violation of North Carolina's unfair and deceptive trade practices act (Counterclaim Six), and declaratory judgment (Counterclaim Seven). (Doc. No. 12.)

On December 30, 2020, Bleep filed a motion for a preliminary and permanent injunction. (Doc. No. 15.) On March 12, 2021, the Court held an in-person evidentiary hearing on this motion. (Doc. No. 39.) Afterwards, the Court granted the request for a preliminary injunction and ordered that Thogus immediately release all bailed property. (Doc. No. 40 at 749.)

Thogus moved to dismiss Bleep's Counterclaim Six on January 20, 2021. (Doc. No. 21.) The Court granted this motion on June 4, 2021. (Doc. No. 43.) On January 28, 2022, Bleep and Thogus both moved for summary judgment. (Doc. Nos. 50, 59.) Thogus moved for summary judgment in its favor on Count One in its amended complaint and Bleep's first, second, fourth, fifth, and seventh counterclaims. (Doc. No. 59 at 3062.) Bleep moved for summary judgment on both counts in Thogus' amended complaint and on its fourth, fifth, and seventh counterclaims. (Doc. No. 50 at 946.)

## II. Discussion

### A. Summary Judgment Standard

**\*3** "A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of showing that no genuine issues of material fact exist." Williams v. Maurer, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Mining Mach., Inc. v. Copley, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.").

A "material" fact is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Abu-Joudeh v. Schneider, 954 F.3d 842, 849-50 (6th Cir. 2020) (additional citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." Queen v. City of Bowling Green, Kentucky, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). "[O]n summary judgment the inferences

to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold*, 369 U.S. 654, 655 (1962); *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting or disputing a fact must cite evidence in the record or show that the record establishes the absence or the presence of a genuine dispute. *See* Fed. R. Civ. P. 56(c) and (e). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

When reviewing cross-motions for summary judgment, the court's analysis remains the same. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) ("It is true that both parties seek to resolve this case through the vehicle of cross-motions for summary judgment, but the standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions."). The Court must draw all reasonable inferences in favor of the non-moving party and determine whether a genuine dispute of material fact exists. *See id*.

### B. Thogus' Claims

#### 1. Count One: Breach of Contract

 ***4** Thogus and Bleep both move for summary judgment on Thogus' breach of contract claim. (Doc. No. 59 at 3081; 50-1 at 955.) Thogus' amended complaint alleges that Bleep committed seven unique breaches of the parties' agreements. (Doc. No. 8-2 at 175, ¶ 65.) In Thogus' summary judgment motion and opposition brief, however, it becomes clear that Thogus has whittled its breach of contract claim to this: Bleep breached the MSA by (a) failing to purchase the minimum purchase requirement in Section 2.2 and (b) refusing to pay for certain costs and expenses associated with Purchase Order 28. (*E.g.*, Doc. No. 59 at 3082.)

#### a. Minimum Purchase Requirement

Section 2.2 of the MSA provides:

> Minimum Purchase: [Bleep] will purchase $5,000,000 worth of Goods from [Thogus] during the Term of this Agreement, unless earlier terminated for cause as set forth in Section 6. If [Bleep] purchases less than $1,5000,000.00 worth (the "**Minimum Amount**") of Goods from [Thogus] during the six (6) month period beginning on the date of the first article inspection report ("**FAIR**") or the termination of this Agreement for any reason or no reason, whichever occurs first (the "**Recoupment Period**"), then [Bleep] shall either: (a) pay a non-refundable recoupment fee to [Thogus] calculated by multiplying the difference between the Minimum Amount and the actual value of Goods purchased during the Recoupment Period (the "**Shortfall Amount**") times 0.343, or (b) purchase the Shortfall Amount of Goods from [Thogus].

(Doc. No. 50-3 at 993 (emphasis in original).) Relevant to Thogus' claim is that Section 2.2 requires Bleep to purchase $1.5 million worth of Goods before the end of a specified time window (the "Recoupment Period") and explains the remedies to which Thogus is entitled if Bleep fails to perform. (*See id*.) Undisputed is that the Recoupment Period began on March 4, 2019, and ended on September 4, 2019. (*E.g.*, Doc. No. 59 at 3083-84.) The only issue pertinent now is whether Bleep met the minimum purchase amount before the end of the Recoupment Period, which turns on what it means to *purchase* a Good.

Thogus argues that a Good was "purchased" after payment was received from Bleep. (Doc. No. 72 at 4237; Doc. No. 77 at 4525.) To Thogus, the fact that Bleep ordered Goods before the end of the Recoupment Period is not enough; the Goods must have been paid for during the Recoupment Period. (*See* Doc. No. 72 at 4237; Doc. No. 77 at 4525.) In support, Thogus provides a calculation report, which shows that Bleep only paid for $611,521.00 worth of Goods during the Recoupment Period. (Doc. No. 59-15 at 3168.)

Accordingly, Thogus asserts that it is owed $304,748, which is calculated by multiplying the $888,479 shortage amount (established by subtracting what Bleep paid within the period ($611,521.00) from the $1,500,000 minimum amount) by the specified .343 penalty percentage. (*Id.*)

Bleep contends that Thogus' definition of purchase fails as a matter of law. Bleep argues that it should be deemed to have purchased a Good if it submitted a purchase order requesting its delivery before the end of the Recoupment Period, even if the Good was paid for after the Recoupment Period concluded. Bleep maintains that its understanding is reasonable because it was only required to pay after Thogus delivered the Goods *and* submitted an invoice. (Doc. No. 50-3 at 996; Doc. No. 75 at 4280.) With this interpretation of its obligations, Bleep provides evidence establishing that it ordered over $1.5 million worth of Goods to be delivered before the conclusion of the Recoupment Period[3] and eventually made over $1.5 million in payments for these Goods.[4] (Doc. No. 75-2 at 4325; Doc. No. 71-25.) To Bleep, this evidence establishes that it satisfied its Section 2.2. obligations. (Doc. No. 71 at 3977-78; Doc. No. 75 at 4280.)

**\*5** This disagreement does not hinge on any disputed facts. This is purely an issue of contract interpretation.

When there is a dispute over the meaning of a contract term, the Court's primary objective is "ascertain the intent of the parties." *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 875 N.E.2d 561, 566 (Ohio 2007). The parties' intent "is presumed to reside in the language they choose in their agreement." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996). Accordingly, "a court must give effect to the parties' expressed intentions; unexpressed intentions are deemed to have no existence." *Covington v. Lucia*, 784 N.E.2d 186, 189 (2003) (citing *Aultman Hosp. Ass'n. v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 922-23 (Ohio 1989)).

To adhere to contract interpretation principles, courts must first determine whether the disputed term is ambiguous. *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). "Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington*, 784 N.E.2d at 190 (quotations omitted). Courts cannot use extrinsic evidence in making ambiguity determinations. *Id.* (citing *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996)). Instead, courts must stick to the four corners of the agreement, construe the contract as a whole, and give reasonable effect to every provision in the agreement. *Tri-State Grp., Inc. v. Ohio Edison Co.*, 782 N.E.2d 1240, 1246 (Ohio 2002); *Stone v. Nat'l. City Bank*, 665 N.E.2d 746, 752 (Ohio 1995). Whether a term is ambiguous is a question of law to be decided by the court. *GHU Invs., LLC v. Myocare Holdings, LLC*, No. 1:21-cv-00510, 2022 WL 5160828, at \*7 (N.D. Ohio Oct. 4, 2022).

In sum, when facing competing interpretations of a contract, the court must evaluate the parties' interpretations and determine whether there is "uncertain[ty] as to which of [the] two...meanings advanced by the parties represent[ ] the parties' true intention." *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, No. 1:02-cv-00013, 2005 WL 6778678, at \*8 (N.D. Ohio Feb. 22, 2005). If there is no such uncertainty, then the contract is not ambiguous. The Court cannot look at Section 2.2 in isolation to evaluate these arguments. *Beasley v. Monoko, Inc.*, 958 N.E.2d 1003, 1011-12 (Ohio Ct. App. 2011). Instead, it must look to other terms in the contract to determine intent.

To support its argument, Thogus provides Merriam-Webster Dictionary's definition of "purchase": "to obtain by paying money or its equivalent." (Doc. No. 77 at 4525.) Citing to the dictionary, however, ignores the parties' express language indicating that the MSA is a contract for the sale of goods. And it is black letter law that contracts for the sale of goods are governed by the UCC. *Cont'l Cas. Co. v. Vertiv Servs., Inc.*, 547 F. Supp. 3d 769, 773 (S.D. Ohio 2021). The MSA's prefatory language expressly states that the purpose of the contract is for Bleep to purchase goods from Thogus. (Doc. No. 50-3 at 989.) And the first section of the MSA, the definitions section, includes the UCC as a defined term. (*Id.* at 993.) In short, after reading the MSA in its entirety, it is clear the parties intended for the UCC to control the meaning of the MSA – not Merriam-Webster's.[5]

**\*6** Thogus' proposed definition of purchase is contrary to the definition provided in the UCC. The UCC defines purchase as "taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue or reissue, gift, or any other voluntary transaction creating an interest in property." Ohio Rev. Code § 1301.201. Under this definition, an item is purchased when it is "tak[en]." *Id.* Simply stated, contrary to Thogus' interpretation, the UCC does not tie the purchase date to the date of payment. For this same reason, Bleep's contention that it can be said to have purchased a good if it agreed to "take" that good within the Recoupment

Case 2:26-cv-00327-KNS    Document 13-4    Filed 03/09/26    Page 5 of 12

Thogus Products Company v. Bleep, LLC, Not Reported in Fed. Supp. (2023)

Period – regardless of when it ultimately paid for said good – does not run afoul of the UCC. Only Bleep has proffered an interpretation of purchase that aligns with parties' express intent to create a contract for the sale of goods.

Further, as Bleep notes, other MSA provisions foreclose Thogus' interpretation of "purchase." Section 5.3 requires Bleep to pay for Goods only after Thogus submits an invoice. (Doc. No. 50-3 at 996.) And, under Section 5.2, Thogus may only submit invoices for delivered Goods. (*Id.*) Together these provisions provide that Bleep could submit purchase orders for the delivery of Goods within the Recoupment Period, but Thogus could delay shipping the Goods and/ or sending invoices to prohibit Bleep from meeting its contractual obligations. If the parties had intended to place Bleep's ability to meet its minimum purchase requirements at the mercy of Thogus, they would have explicitly said so. Instead, and consistent with the UCC, Bleep could comply with its minimum purchase requirements by ordering Goods to be delivered before the end of the Recoupment Period even if those Goods were paid for outside that window.

In the end, Bleep prevails on its motion for summary judgment motion with respect to Thogus' first breach of contract theory because it presented a plausible interpretation of Section 2.2, and Bleep provided evidence that it met its obligation under its plausible interpretation of the provision. Thogus, on the other hand, has neither put forth a reasonable interpretation of Section 2.2 nor attempted to cast doubt on Bleep's interpretation. Thogus has also not pointed to anything in the record undermining Bleep's evidence that it submitted payments for over $1.5 million worth of Goods scheduled to be delivered before the end of the Recoupment Period. Put simply, Bleep met its initial burden under Fed. R. Civ. P. 56, and Thogus failed to meet its burden.[6] *Anderson, 477 U.S. at 250* (once the movant meets its initial Fed. R. Civ. P. 56 burden, the nonmovant bears the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial").

### b. Purchase Order 28 Recoupment

**\*7** Thogus' second theory of breach is that Bleep is liable for both the cost of unused raw materials and the actual-cost value of the Goods manufactured before Bleep instructed Thogus to cease the production and shipment of the Goods stated in Purchase Order 28. (*E.g.*, Doc. No. 72 at 4235-36.)

Under Purchase Order 28, Thogus was required to deliver 4,500 specified Goods by June 2019. (Doc. No. 50-8 at 1044.) But according to evidence provided by Bleep, Thogus' first delivery under Purchase Order 28 occurred on August 6, 2019, and was only for 624 Goods. (Doc. No. 75-8.) Thogus thus failed to comply with Purchase Order 28's quantity and shipment date requirements. (*See id.*) This fact is undisputed.

Thogus' late delivery triggered Bleep's cancellation right, precluding Thogus from obtaining the relief it seeks. The MSA sets forth the cancellation right in Section 4.1:

> Shipment and Delivery Requirements. All Goods shall be shipped F.O.B. [Thogus'] facility and [Bleep] shall be responsible for arranging for and payment to carrier. [Thogus] shall procure materials for, fabricate, assemble, pack, mark and deliver the Goods to [Bleep's] carrier at [Thogus'] facility **strictly in the quantities, by the methods, to the Delivery Locations and by the Delivery Dates, specified in the applicable Purchase Order** or Release. Delivery times will be measured to the time that Goods are actually received at the Delivery Location. If [Thogus] does not comply with any of its obligations under this Section 4, [Bleep] may, **in [Bleep's] sole discretion and at [Thogus'] sole cost and expense**, (a) approve a revised Delivery Date, (b) require expedited or premium shipment, or (c) **cancel the applicable Purchase Order** and obtain similar goods from other sources (and all such Goods will be deemed to have been purchased under this Agreement for purpose of satisfying [Bleep's] quantity requirements hereunder). Unless otherwise expressly agreed to by the Parties in writing, [Thogus] may not make partial shipments or Goods to [Bleep].

(Doc. No. 50-3 at 994-95 (emphasis added).) Bleep unambiguously had the right to cancel Purchase Order 28 after Thogus did not meet the June 2019 deadline. (*See id.*) Section 4.1 plainly states that Thogus was required to deliver Goods "strictly...by the Delivery Dates specified in the applicable Purchase Order." (*Id.*) If Thogus failed to meet this "obligation[ ] under Section 4, [Bleep] may, in [its] sole discretion and at [Thogus'] sole cost and expense...cancel the applicable Purchase Order...." (*Id.*) Bleep undisputedly cancelled Purchase Order 28 on July 17, 2020. (Doc. No. 50-6 at 1039.) And because it did so, it had no obligation to accept the shipment of any Goods ordered in Purchase Order 28. (Doc. No. 50-3 at 994-95.) Further, regarding unused raw materials that Thogus purchased to fulfill its Purchase Order 28 obligations, Section 4.1 also unambiguously provides that Thogus – not Bleep – bears those losses. (*Id.*)

Thogus advances one argument for why Section 4.1 does not foreclose the relief it seeks. It contends that the doctrines of "prevention of performance" and "partial performance" prevent Bleep from retroactively cancelling Purchase Order 28. (Doc. No. 72 at 4245.) To Thogus, these doctrines provide that one party cannot seek relief from another party's breach if they caused the breach. (*Id.* at 4254-55 (citing *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458 (Ohio 2018) and *United States v. Behan*, 110 U.S. 338, (1884))).

**\*8**  Thogus asserts that Bleep prevented it from fulfilling its obligations under Purchase Order 28 by wrongfully instructing it to cease production and shipment of Goods in August 2019. (*Id.*; *see also* Doc No. 59-1 at 3089.) Thogus argues that Bleep had no contractual authority to instruct Thogus to cease production and shipments of Goods that Bleep committed to purchase. (*See* Doc. No. 72 at 4246.) And this "intervention, direction, and instruction for Thogus to cease all further production and shipping under Purchase Order No. 28 **is the sole reason** Purchase Order No. 28 was not fulfilled." (*Id.* (emphasis added).) Thus, Bleep is on the hook for the cost of the unused raw materials and unbought Goods, as Bleep's wrongful conduct created these costs.

In making this argument, Thogus misses a critical fact that it made no attempt to dispute. Thogus failed to meet the June 2019 shipment deadline. (Doc. No. 50-8 at 1044; Doc. No. 75-8.) After June 2019, Section 4.1 gave Bleep the right to cancel Purchase Order 28 in in its entirety, and Thogus bears the costs associated with Bleep choosing to do so. (Doc. No. 50-3 at 994-95.) Bleep demanded that it cease production and shipments in August 2019 – after it had obtained cancellation rights. (Doc. No. 59-1 at 3089.)

Thogus has not shown that the MSA prohibited the manner in which Bleep ultimately chose to cancel Purchase Order 28. It does not point to any language or provision that foreclosed Bleep from first requesting that it cease production and shipment of Goods before formally cancelling the purchase order. Put differently, Section 4.1 leaves open *when* Bleep could cancel a purchase order after Thogus fails to fulfill an obligation.

As a matter of law, Bleep did not prevent Thogus from fulfilling its obligations under Purchase Order 28. Instead, Thogus undisputedly failed to fulfill an obligation, triggering Bleep's cancellation right. And the contract expressly provides that Bleep is not liable for any costs associated with such a cancellation.[7] Thogus' second breach of contract theory fails.

Summary judgment is granted in favor of Bleep with respect to Thogus' breach of contract claim. Accordingly. Thogus' motion for summary judgment with respect to its breach of contract claim is denied.

**2. Count Two: Enforcement of Lien Rights**

Thogus and Bleep agree that the Court's Memorandum Opinion and Order granting Thogus' motion for a preliminary injunction rendered Count Two of Thogus' amended complaint moot. (Doc. No. 40; Doc. No. 50-1 at 967; Doc. No. 59 at 3062 n. 1.) Accordingly, this claim is dismissed, and Bleep's motion for summary judgment on this claim is denied as moot.

**C. Bleep's Counterclaims**

**1. Counterclaims One and Five: FDCA Regulation Claims**

Because Counterclaims One and Five must be summarily dismissed for the same reasons, the Court analyzes them together. Only Thogus moves for summary judgment on Counterclaim One. (Doc. No. 59 at 3084.) Both Thogus and Bleep move for summary judgment on Counterclaim Five. (Doc. No. 59 at 3086; Doc. No. 50-1 at 968.)

**\*9**  Counterclaim Five is a state law breach of contract claim. In it, Bleep accuses Thogus of violating Section 7.1(b) of the MSA. (*See* Doc. No. 12 at 286, ¶ 191.) This section provides:

> [Thogus] shall meet FDA standards for medical devices as well as Buyer's and its quality consultants' requirements for Goods, as amended from time to time.

(Doc. No. 50-3 at 1000.) Notable here is that Section 7.1(b) requires Thogus to "meet FDA standards for medical devices." (*Id.*) Thogus allegedly breached this provision by violating 21 C.F.R. § 820.70(i) and 21 C.F.R. § 820.25. (Doc. No. 50-1 at 958-60.) Both regulations are "current good manufacturing practice requirements" enacted by the Food and Drug Administrative ("FDA") pursuant to the Medical Device Amendment to the Federal Drug and Cosmetics Act ("FDCA"). *Kubicki v. Medtronic, Inc.*, 293 F. Supp. 3d 129,

Case 2:26-cv-00327-KNS Document 13-4 Filed 03/09/26 Page 7 of 12

Thogus Products Company v. Bleep, LLC, Not Reported in Fed. Supp. (2023)

168-69, 177-78 (D.D.C. 2018); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 344 (2001).

Counterclaim One accuses Thogus of committing state law "fraud, fraudulent inducement, and promissory fraud" by falsely stating that it could and would comply with the FDCA regulations at issue in Counterclaim Five.[8] (Doc. No. 12 at 277.) Bleep states that it relied upon this misrepresentation before agreeing to the MSA's terms. (*Id.* at 279, ¶ 141.)

Both state law counterclaims are preempted by federal law. "[U]nder the Supremacy Clause, from which the pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (quotation and citations omitted).

> State-law claims can be preempted expressly in a federal statute or regulation, or impliedly, where congressional intent to preempt state law is inferred. Through an express preemption clause, Congress may make clear that it is displacing or prohibiting the enactment of state legislation in a particular area. By contrast, implied preemption applies in one of two forms: field or conflict. Field preemption occurs where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Conflict preemption may instead be present when Congress has not entirely displaced state regulation over the matter in question. In that circumstance, state law may be preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 859-60 (6th Cir. 2023) (quotations and citations omitted). There is no express preemption clause at issue here. The question is whether Bleep's counterclaims relying on compliance with FDCA regulations are impliedly preempted.

**\*10** Bleep cannot overcome the insurmountable hurdle of implied preemption. The FDCA provides that "[a]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337(a). In *Buckman*, the Supreme Court held that 21 U.S.C. § 337(a) impliedly preempts state law claims premised on conduct that is only made wrongful by the FDCA. 531 U.S. at 348, 353 (holding that plaintiff's state law claims are impliedly preempted by the FDCA because they existed "solely by virtue of the FDCA disclosure requirements"); *see also Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 579 (6th Cir. 2013) ("[W]ere it not for the federal regulatory scheme the FDCA created, there would have been no fraud that could support the tort claim.").

Put another way, "[w]here a state law claim would not exist *but for* a[n] FDCA regulation § 337(a), impliedly preempts the claim." *Patane v. Nestle Waters N. Am., Inc.*, 314 F. Supp. 3d 375, 387 (D. Conn. 2018) (emphasis added). In, *Patane*, the court dismissed state law breach of contract and fraud claims. *Id.* at 391. The plaintiffs alleged that the defendant mislabeled its water as "spring water" and, in doing so, caused consumers to pay more than they would have if the products had been correctly labeled. *Id.* at 378-79. In asserting their claim, the plaintiffs relied on food labeling regulations promulgated under the FDCA to prove that the defendants mislabeled the product. *Id.* 379. Because the claims required the plaintiffs – not the FDA – to prove that an FDCA regulation was violated, the claims were impliedly preempted. *Id.* at 389.

Counterclaims One and Five are entirely dependent on the FDCA. Bleep admits in its summary judgment motion that its breach of contract claim hinges on Thogus' violations of the FDCA regulations stated in 21 C.F.R. § 820.70(i) and 21 C.F.R. § 820.25. (Doc. No. 50-1 at 968-69.) Like the *Patane* plaintiffs, Bleep would have to step into the FDA's exclusive domain to prove that Thogus violated state contract law. 314 F. Supp. 3d at 389. Bleep's Counterclaim One also explicitly alleges that it is entitled to relief because Thogus made materially false "representations, assurances, and promises to Bleep regarding Thogus' operation and maintenance of an FDA compliant manufacturing process...." (Doc. No. 12 at 278, ¶ 138.) Thus, to prevail on this state law fraud claim, Bleep must show that Thogus made misrepresentations about Thogus' understanding of, and disregard for, FDCA regulations. But Bleep is barred from doing so under Supreme Court precedent. *Buckman*, 531 U.S. at 348, 353 (dismissing state law fraud claim).

Bleep could not have brought these state law counterclaims without the FDCA. The counterclaims are therefore impliedly preempted. *E.g., id.*; *Patane*, 314 F. Supp. 3d at 389. Accordingly, Thogus' motion for summary judgment is granted as it relates to Counterclaims One and Five, and

Thogus' summary judgment motion is denied as it relates to Counterclaim Five.

## 2. Counterclaim Two: Mediation Obligations

Only Thogus moves for summary judgment on Bleep's second counterclaim. (Doc. No. 59 at 3085.) This counterclaim alleges that Thogus acted in bad faith and breached the MSA's mediation obligations. (*See* Doc. No. 12 at 279-80, ¶¶ 143-49.) The MSA, in pertinent part, reads:

> Notwithstanding the foregoing, prior to instituting any dispute resolution proceedings, [Thogus and Bleep] shall first submit any dispute arising out of or related to [the MSA] to non-binding mediation and such mediation will take place in either Cleveland, Ohio or Raleigh, North Carolina.

(Doc. No. 50-3 at 1011.) Bleep contends that Thogus' filing of this lawsuit before the parties participated in mediation amounted to a breach of this term. (Doc. No. 12 at 280, ¶ 147.)

**\*11** Thogus argues that this claim fails as a matter of law because (a) it was not required to complete mediation before commencing this lawsuit, (b) Bleep waived its ability to bring this claim by filing a joint motion to stay this litigation while the parties completed mediation, and (c) Thogus participated in a multi-week mediation with Thogus. (Doc. No. 59 at 3085.)

In opposition, Bleep states that the MSA plainly provides that Thogus was required to participate in mediation prior to instituting litigation. (Doc. No. 71 at 3980.) Bleep then provides evidence establishing that Thogus breached this provision. First, it provides a letter from Thogus' counsel to Bleep's CEO demanding that parties coordinate and complete non-binding mediation within 30 days from July 16, 2020. (Doc. No. 71-18.) Second, Bleep shows that it quickly responded to this letter and requested that the parties obtain a mediator with regulatory experience. (Doc. No. 71-20.) Third, Bleep cites Thogus' initial complaint, which was filed on July 20, 2020, before the parties coordinated and completed mediation. (Doc. No. 1-1.)

Replying to these arguments, Thogus argues that there is no cause of action under Ohio law for acting in bad faith in fulfilling contractual mediation obligations. (Doc. No. 77 at 4535.) Thogus also states that Bleep's decision to file a joint motion to stay the case constituted a waiver of Bleep's ability to assert rights relating to mediation under the MSA. (*See id.*) Thogus has ceased asserting, however, that it had no duty to participate in mediation before commencing this lawsuit. (*See id.*)

Thogus' arguments are not well-taken. Bleep asserts a standard breach of contract claim.[9] Bleep has pointed to a term in the contract that created an obligation on behalf of Thogus and provided evidence that Thogus did not fulfill that obligation. Thogus has also not provided any support for the notion that Bleep waived its ability to seek redress for this failure by staying this case while it participated in mediation.[10,11]

**\*12** All in all, Bleep has put forward enough evidence to withstand Thogus' summary judgment motion. The MSA requires Thogus, "prior to instituting any dispute resolution proceedings[,]" to "first submit any dispute arising of or related to [the MSA] to non-binding mediation." (Doc. No. 50-3 at 1011.) Bleep has put forward evidence that Thogus failed to do so. It initiated this case on July 20, 2020, undisputedly before the parties participated in mediation. (Doc. Nos. 1-1, 71-18, 71-20.) Contrary to Thogus' motion, Bleep has provided evidence supporting a valid breach of contract claim. Accordingly, Thogus' motion is denied as it relates to this claim.

## 3. Counterclaim Four: Warranty Obligations

Bleep's fourth counterclaim alleges that (a) Thogus shipped defective Goods, and (b) Thogus failed to remedy these problems as required by the MSA. (*See* Doc. No. 12 at 283-85, ¶¶ 167-80.) Both Thogus and Bleep contend they are entitled to summary judgment on this counterclaim. (Doc. No. 59 at 3085; Doc. No. 50-1 at 967.)

The Court's analysis begins with the relevant MSA provisions. Section 7.1(a) requires Thogus to "meet or exceed [Bleep's] quality standards for the Goods as adopted by [Bleep]...." (Doc. No. 50-3 at 999.) Section 9.3 expands this promise:

> Product Warranty. [Thogus] warrants to [Bleep] that (the "**Product Warranty**"): (a) for a twelve (12) month period commencing on the Delivery Date, the Thogus Goods:
> 
> (i) conform, in all respects, to the Specifications;

Case 2:26-cv-00327-KNS    Document 13-4    Filed 03/09/26    Page 9 of 12

Thogus Products Company v. Bleep, LLC, Not Reported in Fed. Supp. (2023)

(ii) conform with [Bleep's] quality standards provided to [Thogus] to [Thogus], if any;

(iii) be free from defects, latent or otherwise, in materials, and workmanship

....

(*Id*. at 1002.) The Second Amendment to the MSA provides that Thogus' warranty obligations do not extend to any complications related to Bleep's decision to stretch the Short Hose components. (Doc. No. 71-10.)

These provisions collectively provide a straightforward framework for analyzing Bleep's counterclaim. The MSA requires Thogus to ship Goods that meet Bleep's quality standards and are free from defects. (Doc. No. 50-3 at 999, 1002.) Bleep has twelve months after receiving any unsatisfactory Goods to notify Thogus of any failure to fulfill this expectation. (*Id.* at 1002.) The MSA's warranty does not extend to anything arising out of Bleep's decision to stretch the Short Hose components. (Doc. No. 71-10.)

Against this backdrop, the Court finds that Thogus' first two arguments in support of its motion for summary judgment fail. *First*, Thogus contends that summary judgment is appropriate because the alleged defects relate to the stretched Short Hose components and are beyond the scope of the MSA's warranty. (Doc. No. 72 at 4249-52.) But even Thogus notes that the Second Amendment to the MSA is limited and, by its terms, does not cover all the defects identified by Bleep. (*Id.* at 4251 (Thogus admitting some of the problems consist of "missing or damaged parts...."); Doc. No. 77 at 4528-29 (Thogus noting that not all complaints were about the Short Hose components).) *Second*, Thogus argues that Bleep has not shown that it submitted its warranty claims within the 12-month period outlined in the MSA. (Doc. No. 72 at 4242.) But Bleep defeats this argument by citing numerous packaging slips indicating that Thogus shipped Goods to Bleep between August and September 2019. (Doc. No. 75-8.) And Bleep also submits a July 20, 2020, letter to Thogus asserting its warranty rights. (Doc. No. 50-19.) Thus, the only record evidence before this Court establishes that Bleep timely invoked the warranty provision.[12] (Doc. Nos. 75-8, 50-19.)

**\*13**  The Court now turns to whether Thogus shipped either defective Goods or Goods that did not meet Bleep's expectations.

Thogus explains that its expert witness performed a retrospective study of Thogus' manufacturing process. (Doc. No. 77 at 4529.) In conducting the study, the expert reviewed and analyzed the production entries for Goods manufactured under Purchase Order 28 using validated software. (Doc. No. 60 at 3226-28; Doc. No. 58-1 at 2815.) The expert witness concluded with a "99% confidence limit" that all the Goods manufactured by Thogus met or exceeded Bleep's standards. (Doc. No. 58-1 at 2816.) The expert witness also confirmed that the system was not producing any false positives by ensuring that a nonconforming good would trigger a warning from the system. (*Id.* at 2815-16.) Based on this testimony, Thogus contends that a reasonable jury could only find that it did not breach its warranty obligations. (*See* Doc. No. 77 at 4529.)

For its part, Bleep points to evidence in the record that it received customer complaints about defective Goods, including complaints about missing components and visibly cracked tubing. (Doc. No. 51.) Bleep also attaches pictures of some of these defective products to its summary judgment motion. (Doc. No. 50-16.) Finally, Bleep's general counsel testified that Bleep was forced to ship replacement parts to customers to remedy these problems. (Doc. No. 50-6 at 1039.)

In the end, neither party has shown that a reasonable jury could only disregard the other's evidence and rule in favor of them. Bleep calls Thogus' testimony "misleading" and criticizes the retrospective study generally. (Doc. No. 75 at 4285.) But at this stage in litigation determining the amount of weight this testimony should be given is the job of the jury, not the Court. *Anderson*, 477 U.S. at 249. And, as Bleep exclaims throughout its briefs, Thogus has not presented any evidence directly refuting Bleep's evidence that Thogus produced defective Goods. (Doc. No. 71 at 3982; Doc. No. 75 at 4282.) A jury could disregard the expert testimony and find that Thogus breached its warranty obligations.[13]

Neither side has carried their burden for summary judgment as movants, and both motions are denied as they relate to Bleep's second counterclaim.

**4. Counterclaim Seven: Declaratory Judgment**

Bleep's seventh counterclaim is for a declaratory judgment under 22 U.S.C. § 2201. (Doc. No. 12 at 289, ¶ 206.) "Bleep asks the Court to declare that Bleep does not owe Thogus any of the amounts Thogus demands for the unfinished and

undelivered products or components." (*Id.*) Both Thogus and Bleep move for summary judgment on this counterclaim. (Doc. No. 50-1 at 969-71; Doc. No. 59 at 3086.)

**\*14** The Court has already ruled on the merits of this claim by granting Bleep summary judgment on Thogus' breach of contract claim, finding that Bleep did not skirt obligations to Thogus by refusing to pay for unfinished Goods and unused components because of Bleep's cancellation of Purchase Order 28.

Thogus, however, contends that the Court should not reach the merits of this counterclaim because "it is duplicative of Bleep's breach of contract counterclaims," which weighs in favor of the Court declining to use its discretion to grant a declaratory judgment. (Doc. No. 77 at 4535-36; Doc. No. 59 at 3086; Doc. No. 72 at 4252.) This contention is wrong. Bleep's breach of contract counterclaims relate to Thogus' duties under the MSA, whereas this counterclaim seeks a declaration regarding the scope of Bleep's MSA obligations. If anything, it is duplicative of Thogus' breach of contract claim, not Bleep's counterclaims.

Nonetheless, the Court considers whether it should exercise its discretion in hearing this claim. To do so, courts are instructed to consider the following factors:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for res judicata; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (quotation omitted).

Applying these factors, the Court finds that the first, second, and fifth factors weigh against exercising discretion over this counterclaim. *See id.* The Court has resolved this dispute by granting Bleep summary judgment on Thogus' breach of contract claim. Bleep has not explained why it is necessary for the Court to do so again. The other factors have little relevance here and do not weigh for or against the Court hearing this counterclaim. No factor weighs in favor of the Court's exercising discretion.

Accordingly, the Court declines to exercise discretion over Counterclaim Seven. The counterclaim is dismissed, and both motions for summary judgment on this counterclaim are denied as moot.

### III. Conclusion

For the reasons stated herein, both motions for summary judgment are GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5607458

---

Footnotes

1   For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

2   Unlike Purchase Order 25, Purchase Order 28 does not include full delivery dates. For example, it states that the first delivery date is "June-19." (Doc. No. 50-8.) Bleep interprets "June-19" as June 2019 rather than June 19, 2019. (Doc. No. 50-1 at 953-54.) Because Thogus does not dispute this interpretation, it is adopted by the Court.

3   The delivery dates contemplated in Purchase Orders 25 and 28 were both before the end of the Recoupment Period. (Doc. Nos. 50-15, 50-8.)

4   Bleep admits that it only submitted payments for $1,456,296.72 worth of Goods. (Doc. No. 75 at 4280.) However, through invoices and deposition testimony, Bleep establishes that this amount does not include the $130,000 in credits it received for purchasing and shipping certain raw materials on Thogus' behalf. (Doc. No. 75 at 4280; Doc. No. 71-26 at 4230; Doc. No. 71- 25.) Thogus does not dispute that it credited these purchases towards the amount Bleep owed. Nor does Thogus

Case 2:26-cv-00327-KNS    Document 13-4    Filed 03/09/26    Page 11 of 12

Thogus Products Company v. Bleep, LLC, Not Reported in Fed. Supp. (2023)

|   |   |
|---|---|
|   | contest Bleep's assertion that the value of these credits must count towards the amount of Goods Bleep purchased under Section 2.2. The Court, therefore, finds that these credits count towards Bleep's payments. |
| 5 | Even so, Merriam-Webster's definition does not move the needle for Thogus. It only states that an item is purchased if it is "obtain[ed]" by "paying money or its equivalent." It notably does not state that the item must be paid for *before* it is obtained to be purchased. So, Bleep could have "obtained" a Good by agreeing to pay money in the future and still be said to have purchased the Good before making a payment. |
| 6 | This is not to say that there are no ambiguities lurking in the interpretation of Section 2.2 advanced by Thogus. For example, pursuant to Purchase Order 25, Thogus was originally required to deliver Goods on January 22, 2019, and February 11, 2019, before the beginning of the date that triggered the minimum purchase window. (*E.g.*, Doc. No. 59 at 3077.) But, according to Thogus, delivery of Goods under Purchase Order 25 was delayed and not complete until July 31, 2019 – undisputedly within the Recoupment Period. (Doc. No. 59 at 3077; Doc. No. 59-2 at 3093.) Nonetheless, Bleep's argument implies that purchase orders contemplating shipments before the opening of the Recoupment Period count towards the minimum requirement. This is far from an absurd interpretation, as Thogus still benefits from the $1.5 million guarantee – albeit on a slightly earlier timeline than initially contemplated. And Thogus' silence on this issue implies that it does not dispute those early orders could count. It is also not this Court's job to invent arguments on Thogus' behalf on why Bleep's assumption may be wrong. *E.g.*, *Mid-Century Ins. Co. v. Fish*, 749 F. Supp. 2d 657, 675 (W.D. Mich. 2010) ("[I]t is not the court's role to create and develop arguments for the parties, and the court will not do so here."). The Court's holding merely reflects the arguments and uncontested evidence presented in the parties' briefs. *See Gentek*, 2005 WL 6778678, at *8 (noting the court's job is to evaluate the interpretations of the contract presented by the parties). |
| 7 | Thogus points to record evidence showing that Bleep may have asked Thogus to cease production and shipments of Purchase Order 28 Goods because it was having financial difficulties. (*See, e.g.*, Doc. No. 72 at 4247.) Thogus also provides evidence that Bleep consistently failed to remit timely payments. (*E.g.*, Doc. No. 59-2 at 3093.) The problem is that Thogus provides no legal basis for finding that these facts are relevant to whether Thogus could assert its cancellation right under Section 4.1. Nothing in Section 4.1's text provides that the reason motivating the cancellation must be Thogus' failure to fulfill a shipping obligation. Assuming that Bleep was motivated purely by its financial difficulties, Thogus still must confront (a) the undisputed fact that it made untimely shipments and (b) such untimeliness allowed Thogus to cancel Purchase Order 28. |
| 8 | Although Bleep does not explicitly clarify the FDA regulations that its counterclaim is premised on, it appears to be directly related to the same FDCA regulations at issue on Counterclaim Five. For example, in Counterclaim One, Bleep alleges that Thogus lied about validating its manufacturing software. (Doc. No. 12 at 279-79, ¶¶ 138-39, 142.) 21 C.F.R. § 820.70(i) dictates when a manufacturer must validate its software. |
| 9 | Paragraph 148 of this counterclaim alleges that Thogus breached the implied covenant of good faith and fair dealing because of its behavior at the mediation. (Doc. No. 12 at 280, ¶ 148.) The Court need not address this aspect of this claim because there is sufficient evidence about Thogus' behavior before the mediation for this claim to survive Thogus' summary judgment motion. |
| 10 | This fact seems highly relevant for the damages element of a breach of contract claim. *White v. Pitman*, 156 N.E.3d 1026, 1036 (Ohio Ct. App. 2020) ("The elements of a breach-of-contract claim are the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." (cleaned up)). But Thogus notably does not move for summary judgment on the issue of whether Bleep can establish the damages element of the breach of contract claim. |
| 11 | Under Ohio law, a party waives any right to damages for another's breach if "they failed to treat the contract as breached but instead continued to operate thereunder." *Alfa-Laval, Inc. v. Cow Supply, Inc.*, No. 3-88-18, 1990 WL 61743, at *5 (Ohio Ct. App. 1990). It is hard for this Court to fathom how requesting that litigation be stayed so that mediation could be conducted can be construed as treating the MSA as not being breached when Thogus prematurely initiated this lawsuit. |
| 12 | Thogus also argues that the MSA's Section 4.5 places temporal limits on when Bleep can invoke its warranty rights. (Doc. No. 77 at 4532.) Section 4.5 gives Bleep 15 days after receiving a shipment to inspect the Goods and reject any nonconforming ones. (Doc. No. 50-3 at 995.) Because Bleep did not reject any of the allegedly defective Goods within |

Case 2:26-cv-00327-KNS     Document 13-4     Filed 03/09/26     Page 12 of 12

**Thogus Products Company v. Bleep, LLC, Not Reported in Fed. Supp. (2023)**

15 days, Thogus argues Section 4.5 precludes Bleep from seeking any relief. (Doc. No. 77 at 4532.) But Section 4.5 expressly states that Bleep's "acceptance of any Goods will not be deemed to be a waiver or limitation of [Thogus'] obligations pursuant to this Agreement (or any breach thereof), including those obligations with respect to [Thogus'] Product Warranty and [Thogus'] duty to indemnify [Bleep]." (Doc. No. 50-3 at 995-96.) In other words, Bleep does not lose warranty protections by accepting a Good. (*See id.*)

13   Because the Court has found that there is a triable issue of fact as it relates to the first part of Bleep's fourth counterclaim – whether Thogus sent Goods that triggered the warranty provisions – it need not examine the relevant contract provisions and evidence that relate to the second part of the counterclaim: Thogus' obligations and Bleep's remedies once Bleep submitted a warranty claim.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.