**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANTHONY WHITFIELD,** individually and on behalf of all others similarly situated, <br><br> *Plaintiff,* <br><br> *v.* <br><br> **PRIME AGENCY, LLC** <br><br> *Defendant.* | Case No. <br><br> 2:26-cv-00327 <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

**OPPOSITION TO DEFENDANT'S MOTION TO AMEND**

This Court is placed in yet another tough position stemming from the apparent undisclosed use of AI, in contravention of this Court's own standing order regarding the same.[1] Defendant Prime Agency, LLC now asks the Court to permit it to file an amended Memorandum of Law in support of its Motion to Dismiss to substitute a purportedly "corrected" version.

The timing and circumstances of this request warrant close scrutiny.

Plaintiff's Opposition to the Motion to Dismiss (ECF No. 13) identified at least three fabricated case citations, additional misrepresentations of existing authority, and a procedurally improper "counterclaim" embedded within the Memorandum. Only after those defects were exposed in Plaintiff's opposition does Defendant now come forward with a claim that the

---

[1] This Court's standing order, available at https://www.paed.uscourts.gov/sites/paed/files/documents/procedures/scopole.pdf, and attached herein as Exhibit A, requires counsel using generative AI to "disclose that generative AI has been used to assist with the citation of legal authority, disclose what specific generative AI program was used, and **CERTIFY** that each and every citation of legal authority has been verified as accurate."

Memorandum it filed was supposedly "an earlier draft version" and that the "correct" version should be substituted in its place. This is not a proper request under Rule 15, which itself applies only to pleadings, not motions. It is a bid to replace a signed filing, one that was printed out and scanned bearing counsel's wet-ink signature, after Plaintiff observed and raised in his opposition the presence of apparently fabricated and incorrect authorities contained in it.

Courts addressing similar circumstances have recognized this pattern and have declined to permit *post hoc* correction to serve as a substitute for Rule 11's obligations of diligence required *before* a filing is submitted. The Court has good reason to take its AI-related certification rules seriously, because if counsel can file a deficient brief, wait to see whether opposing counsel catches the defects, and then characterize the filing as the "wrong draft" without consequence, this Court's certification requirement, and Rule 11, are rendered meaningless. That is the harm and prejudice this Court should be concerned with.

Notably, the Motion to Amend itself is not free of these same problems. Defendant quotes the Supreme Court in *Foman v. Davis*, 371 U.S. 178, 182 (1962), for the propositions that "the pleading philosophy of the Rules" is that "'a party should be afforded' an opportunity to test his claim on the merits." Those quotations do not appear in *Foman*. The *very motion* seeking to amend the filed and signed Memorandum thus contains yet another inaccurate quotation attributed to a real case. The Court can draw its own conclusions from this continued pattern.

## BACKGROUND

On February 16, 2026, Defendant filed its Motion to Dismiss (ECF No. 7), supported by a *printed* Memorandum of Law bearing *three* wet-ink signatures of Defendant's counsel, Mark T. Sophocles. The Memorandum was printed, physically signed, and scanned for filing on the docket. It was not an electronic signature inadvertently appended to a wrong file, and it was not

an obviously draft document. It was a document styled as a Memorandum that counsel printed out, presumably reviewed, signed, scanned, and submitted.

On February 17, 2026, the following day, Plaintiff's counsel emailed Defendant's counsel identifying (1) the impropriety of moving to dismiss ATDS allegations "when no ATDS claim is lodged," and (2) observing that the Memorandum "purports to file a Declaratory Judgment counterclaim in the same pleading as a motion to dismiss." (Exhibit B). Mr. Sophocles replied the same day, presumably after having reviewed the Memorandum he filed and the allegations in the Complaint, by first stating, "I inadvertently referenced ATDS and can strike that portion of the motion if you want to stipulate to allow me to file a corrective filing or simply blow it out in your response." Mr. Sophocles later replied, "Sorry for mixed messaging but got back to my office and reviewed the Complaint again.  Accordingly I have no objection to pro hac BUT ignore the last email about deleting the ATDS since your complaint in paragraph #4 references "technology capable of generating thousands of similar calls per day" so *it's fine as drafted*." (Exhibit B) (emphasis added). Critically, this email serves as an admission that Attorney Sophocles re-reviewed the Motion he now claims was a "draft" version and determined that it was "fine as drafted." This position is inconsistent with the one taken now.

On March 9, 2026, Plaintiff filed his Opposition to the Motion to Dismiss (ECF No. 13), which identified, among other deficiencies, at least three fabricated case citations, misrepresentations of the courts' holdings in two other cases, *Mauthe v. Optum Inc.* and *Gadelhak v. AT&T Servs., Inc.*, and the procedurally improper counterclaim. The Opposition requested that the Court issue an order to show cause regarding counsel's apparent use of fabricated authorities. On March 11, 2026, two days after the Opposition was filed, Defendant filed the instant Motion for Leave to Withdraw and Substitute Memorandum of Law (ECF No.

15), characterizing the original filing as a "draft version" uploaded due to "clerical oversight."

Defendant claims it "discovered the error on March 10, 2026 shortly after receiving the

Plaintiff's response to the filing." The sequence speaks for itself. Counsel printed the

Memorandum, signed the Memorandum, scanned the Memorandum, filed the Memorandum,

engaged in multiple emails regarding substantive defects in it, took no corrective action, and

sought to replace the Memorandum only after the Opposition exposed the fabricated authorities.

## LAW AND ARGUMENT

1. **Plaintiff has been prejudiced through needing to respond to hallucinated authorities in the original Memorandum and the continued failure to make the appropriate AI disclosures.**

Defendant asserts that Plaintiff "will suffer no prejudice" from the substitution because

"[t]he core legal theories of the 12(b)(6) motion remain identical" and "only the supporting

citations are being corrected." As an initial matter, that is plainly false. Defendant has not simply

removed the offending citations from its Memorandum and sought to refile a corrected

Memorandum.[2] It instead has taken this opportunity to completely rewrite the Memorandum,

reframing some arguments in different ways while incoherently attempting to maintain others

without legitimate basis. Defendant's proposed amendment is not a simple attempt to retract its

hallucinated authorities. It is a fundamental rewrite aimed at obtaining a more advantageous

position. In essence, Defendant seeks to be rewarded for its own apparent misconduct. Moreover,

---

[2] To be clear, Plaintiff's position is that Rule 11 requires the immediate withdrawal and/or retraction of the hallucinated and otherwise inaccurate authorities, and that by refusing to do so, Defendant is further committing sanctionable conduct. *Mata*, *infra*, 678 F. Supp. 3d at 461 (S.D.N.Y. 2023) (noting that "[a] fake opinion is not "existing law" and citation to a fake opinion does not provide a non-frivolous ground for extending, modifying, or reversing existing law, or for establishing new law" under Rule 11 and that "[a] court may impose sanctions on a party for refusing to withdraw an allegation or claim even after it is shown to be inaccurate"). In opposing Defendant's bid to amend, Plaintiff expressly disclaims the position that it is appropriate for these inaccurate authorities to remain on the docket.

Defendant ignores, and completely fails to address, the concrete prejudice Plaintiff has already suffered in finding, verifying, searching, double checking, and briefing each and every one of Defendant's inaccurate authorities, in addition to needing to double-check each of the citations in Defendant's instant Motion, which revealed the above-referenced inconsistency.

Plaintiff's counsel was required to research and respond to the original Memorandum, as filed, including expending time and resources to identify that three of the cited cases did not exist, that the representations of *Mauthe* and *Gadelhak* were materially inaccurate, and that the ATDS and declaratory judgment arguments were baseless, which Plaintiff himself raised in correspondence. That work was necessitated entirely by defects in the original signed filing. If leave to file the proposed amended Memorandum is granted, Plaintiff's counsel will have to research yet more authority and respond to additional arguments and assertions not contained in the original Memorandum. Seeking to file a corrected Memorandum is understandable, and, as outlined above, the minimum Rule 11 requires, but the Memorandum sought here effectively permits Defendant to profit over its own malfeasance. Plaintiff should not have to bear the cost of counsel's failure to verify the contents of a filing before signing and submitting it.

More broadly, granting amendment would sanction a practice in which counsel can sign and file a pleading containing fabricated authorities and send the message that the problem can simply be erased through amendment once the opposing party exposes those defects as a "no harm, no foul." As the court observed in *Hayes*, "[m]any harms flow from the submission of fake opinions. The opposing party wastes time and money in exposing the deception. The Court's time is taken from other important endeavors." *United States v. Hayes*, No. 2:24-cr-0280-DJC, 2025 WL 235531, at *13–15 (E.D. Cal. Jan. 17, 2025). The waste of "time and money" that Plaintiff's counsel and doubtless this Court have spent in exposing not only the deception thus

far but also brought about by the apparent failure to abide by this Court's standing order on the use of AI is precisely the type of prejudice that will be caused by allowing the proposed amended Memorandum, which itself appears to bear undisclosed indicia of AI use, to be filed.

2. **The original filing was not a clerical error. It was a signed submission that Defendant seeks to replace only after non-existent citations were identified.**

Defendant frames this motion as a routine correction of "inadvertent" citation errors that resulted in the filing of "several incorrect or 'placeholder'" case citations. But this is not a case of a transposed digit in a citation or a misspelled case name, nor is it the case of an obvious placeholder like *Doe v. Smith*, XXX F.Supp. XXX (E.D. Pa. 9999). The original memorandum contained at least three *entirely fabricated* case citations, *Wilson v. Quest Diagnostics*, *Smith v. Vision Solar LLC*, and *Samuel v. U.S. Bank*, none of which exist. It also materially *misrepresented* the holdings of *Mauthe v. Optum Inc.* and *Gadelhak v. AT&T Serv's., Inc.* The original filing further contained a procedurally improper "counterclaim for declaratory judgment" embedded within a motion to dismiss and further argued that Plaintiff's claims failed under the TCPA's ATDS provisions, a claim the Complaint never made. These errors reflect fundamental deficiencies in the substance of the Memorandum itself.

Critically, the original Memorandum was not filed electronically with a "/s/" signature. It was printed, physically signed in *three places* by Mr. Sophocles, and scanned for filing. Even more so than an electronic signature, a wet ink signature represents that counsel has reviewed the document, stands behind its contents, and certifies that the representations therein comply with Rule 11 of the Federal Rules of Civil Procedure. It is a violation of Rule 11 to sign one's name to a document that one has not read. *Fid. Bank, Nat. Ass'n v. Gill*, No. CIV. A. 90-7505, 1991 WL 54095, at *3 (E.D. Pa. Apr. 8, 1991), *aff'd*, 950 F.2d 721 (3d Cir. 1991) ("Federal Rule of Civil Procedure 11 provides that the signature of an attorney constitutes a certificate by the signer that

the documents *have been read* and that the information is correct."); *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278 (3d Cir. 1994) ("It is clear that the signer has a "personal, nondelegable responsibility" to comply with the requirements of Rule 11 before signing the document."). One does not print, sign, scan, and file a document one has not read.

Only after Plaintiff's Opposition identified the fabricated authorities did Defendant come forward with the explanation that an "earlier draft version" was filed. Courts have rejected this exact *post hoc* explanation. In *Coomer v. Lindell*, defense counsel responded to a show cause order by claiming that the filed brief was the "wrong version" and that a corrected "final" version should have been filed instead. No. 22-CV-01129-NYW-SBP, 2025 WL 1865282, at *4 (D. Colo. July 7, 2025). As here, the attorney claimed that he "printed the drafts out and closely reviewed the final version that was to be filed" but that a draft version was filed inadvertently.

In *Coomer*, the attorney attempted to justify his position by claiming that he was on vacation in Mexico and delegated the final review and filing of the subject filing to an associate owing to internet issues. *Id.* He also pointed out that he received a "Westlaw citation report" from the associate and further pointed out that the document that was filed was a draft version because it "[did] not include a completed certificate of service." *Id.* In support thereof, the attorney also provided copies of emails in apparent substantiation of this version of events. Judge Wang rejected that explanation after comparing "counsel's representations with the documentary record before it." *Id.* The court sanctioned counsel and emphasized that filing a paper without the necessary care in preparing it reflected "gross carelessness by counsel" that was itself sanctionable, regardless of which "version" was intended. *Id.* at *5, *8. The Court was not persuaded that the filing was "simply an inadvertent error, given the contradictory statements and the lack of corroborating evidence." *Id.* at *8.

Similarly, in *Dodds v. Bridges*, counsel attempted to explain fabricated citations as "transcription errors" introduced when an "outside source prepared the typed brief." The Tenth Circuit expressed significant skepticism about that explanation, observing that it did not account for how an entirely fictitious citation, paired with a fabricated quotation, could have been produced through transcription. *Dodds v. Bridges*, No. 25-7021, 2026 WL 380194, at \*5 (10th Cir. Feb. 11, 2026). The court concluded that the problems had the hallmarks of AI-generated hallucinations and warned the litigant against submitting such citations in the future, but declined to sanction the litigant, owing to his *pro se* status. *Id.*

These cases prove instructive here. The original Memorandum did not contain minor transcription errors or obvious placeholders. It contained fabricated case names, fabricated Westlaw citations, and fabricated holdings attributed to those nonexistent cases. It contained incorrect statements of the law. It addressed causes of action not even present in the Plaintiff's Complaint. And it asserted a procedurally impermissible counterclaim for declaratory judgment. Plaintiff's counsel raised the latter two issues in writing. (Ex. B.) Mr. Sophocles re-reviewed the Memorandum he signed and represented that it was "fine as drafted."

Defendant only now seeks to amend (or, perhaps more accurately, fundamentally rewrite) the Memorandum once these issues were raised in opposition. The proposed "amended" Memorandum, while removing the three fabricated citations, still contains the same structural deficiencies. The ATDS argument remains (though Defendant now concedes Plaintiff asserts no ATDS claim) and the declaratory judgment "counterclaim" is recharacterized as "irrelevant" but perplexingly warranting dismissal "regardless of any procedural dispute concerning Defendant's

declaratory request."[3] The standing analysis continues to misapprehend Third Circuit precedent, citing from various irrelevant cases with little apparent relation to the case at bar, such as in the civil rights context, despite the presence of directly applicable authority. And interspersed throughout the "amended" Motion are replies to various matters raised in the Plaintiff's opposition, which is classic reply material inappropriate for inclusion in an amendment.

Finally, as noted above, the Motion to Amend itself attributes inaccurate quotations to *Foman v. Davis*, 371 U.S. 178 (1962). The phrases "the pleading philosophy of the Rules" and "'*a party should be afforded an*' opportunity to test his claim on the merits" do not appear in the *Foman* opinion. Indeed, the word "philosophy" appears nowhere in that opinion.[4] That the very motion seeking to cure citation defects introduces two inaccurate quotations undercuts Defendant's representation that the original errors were a clerical mistake and further demonstrates why amendment would be both prejudicial and futile.

3. **Continued apparent failure to follow this Court's AI Disclosure standing order counsels against granting leave to amend, which is procedurally improper.**

This Court's standing order requires counsel using generative AI to "disclose that generative AI has been used to assist with the citation of legal authority, disclose what specific generative AI program was used, and **CERTIFY** that each and every citation of legal authority

---

[3] The proffered explanation for bringing an impermissible counterclaim in a motion to dismiss borders on incomprehensible, further demonstrating that any "amendment" would be futile. It states, "Moving Defendant, raised the declaratory relief motion in order to assert a cogent basis to determine that no statutory violation occurred, the compliance paradigm was sufficiently adhered to and that no standing exists under Article III as no harm or injury has been plausibly alleged to avoid dismissal." This sentence *sounds* good, but it fails to articulate or advance any substantive legal theory or explanation.

[4] Plaintiff anticipates that Defendant may try to explain these inconsistencies away by claiming that such misattributions are the product of misplaced quotation marks. Plaintiff respectfully observes that Microsoft Word's default processing of such marks is to utilize so-called "smart quotations" (") when the " " key is typed, as opposed to using so-called "dumb" quotation marks (") when content is copied and pasted from an external application, such as an AI website.

has been verified as accurate." Defendant's original Memorandum contained no such certification. The instant Motion to Amend likewise contains no such certification.

Plaintiff does not ask this Court to speculate about what tools were used to draft the original Memorandum. However, the original filing's characteristics, including fabricated case names, fabricated Westlaw citation numbers, misstatements about the law, and misstatements about the underlying pleadings, are all consistent with the hallucinated outputs of generative AI tools, as multiple federal district and appellate courts have recognized. *See, e.g.*, *Dodds*, 2026 WL 380194, at *5 (quoting *Jones v. Kankakee Cnty. Sheriff's Dep't*, 164 F.4th 967, 969 (7th Cir. 2026) for the proposition that hallucinations are "a circumstance where an AI large language model generates an output that is fictional, inaccurate, or nonsensical"); *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 456 (S.D.N.Y. 2023). But Plaintiff need not prove intent or the absence of error at this stage. The nature of the errors is sufficient reason for the Court to hold that a generative AI was "used to assist with the citation of legal authority," without disclosure, even if only in a draft that was wrongly filed. This Court can act on the absence of the disclosure itself.

This fight is also not one about amending pleadings at all. "Rule 15(a) does not permit a party to "amend" a motion after it is filed." *Green v. Shoreline Cmty. Coll.*, No. C06-465P, 2006 WL 3761366, at *15 (W.D. Wash. Dec. 21, 2006), *aff'd*, 295 F. App'x 126 (9th Cir. 2008) (quoting 6 *Federal Practice & Procedure* § 1475). Rule 15 provides no basis to grant leave to amend here, rendering Defendant's motion procedurally improper. Rule 15 governs amendment of *pleadings*, and Rule 7(a) lists what pleadings are. A memorandum of law supporting a motion is not one of them; motions and other papers fall under Rule 7(b), not Rule 7(a).

The Court's disclosure rule goes beyond the limits imposed by Rule 11, and for good reason. It not only ensures that counsel takes personal responsibility for the contents of every

10

filing but also certifies to parties and the Court that they can trust the authorities cited to them. And it alerts Courts and parties to specific citations requiring extra scrutiny and review to ensure AI accuracy. If counsel can file a brief with undisclosed AI use containing fabricated citations, wait to see if opposing counsel identifies the defects, and then seek to withdraw and replace the filing without consequence, the disclosure rule has no teeth. Counsel in future cases will have every incentive to take the same approach: file first, verify later, and disclose only if caught.

The Fifth Circuit's recent decision in *Fletcher v. Experian Info. Sols., Inc.*, 168 F.4th 231, 233 (5th Cir. 2026), is particularly instructive. There, Chief Judge Elrod sanctioned an attorney $2,500 not just for the use of AI in drafting the legal documents but also because the attorney "was not forthcoming in her response to the show-cause order." The *Fletcher* Court first observed that the Fifth Circuit had proposed, but declined to adopt, a rule similar to this Court's standing order on the basis that "existing rules such as Federal Rule of Civil Procedure 11 . . . already impose an obligation on counsel to submit accurate information to courts." *Id.* at 234. In *Fletcher*, the Fifth Circuit made counsel aware of inaccuracies in the brief and requested an explanation of counsel. *Id.* at 237. However, counsel's "response was disappointing" and did not admit to AI use, instead stating that she "relied on publicly available versions of the cases, which [she] believed were accurate," including "several well-known legal databases." *Id.* The Fifth Circuit did "not find it credible that these sources produced the hallucinated quotations that appeared in Hersh's brief" and counsel "finally admitted to the use of AI" only when "asked specifically about whether she used AI." *Id.* at 238.

Plaintiff cites *Fletcher* for what it says on taking responsibility and evasion. Defendant's failure to make not one but two appropriate disclosures in line with the Court's standing order itself justifies denial of the Defendant's motion and the imposition of further sanctions. Like in

11

*Fletcher*, Plaintiff's counsel, and this Court, would not have been brought to this very point if Defendant had simply accepted responsibility in its instant motion and been more candid about what happened here. But instead, Defendant's counsel, like the counsel in *Fletcher*, has not admitted to AI use but instead represented that the apparent hallucinations were simply "placeholders" in a "draft" that was "inadvertently uploaded."

*Fletcher's* takeaway is clear. Transparency matters, and the failure to be forthcoming compounds the original problem. Even if AI was used to research authorities in the draft, the plain text of this Court's standing order required Mr. Sophocles to disclose its use, verify the citations, and personally attest to their accuracy. Mr. Sophocles did not do so in any of the motions he has filed, despite being required to. Attorney Sophocles has offered no explanation for why the required AI certification was not provided in either the Memorandum or the instant Motion and has not directly addressed whether AI tools were used in the preparation of either filing or its drafts. The Court can draw whatever conclusions it wishes from that silence itself.

### **CONCLUSION**

For the foregoing reasons, the Court should deny the Motion to Amend and separately issue whatever orders it determines necessary arising from the apparent failure to disclose AI use, as well as any apparent AI use itself.

<div style="margin-left: 40%;">

Plaintiff,
By Counsel

</div>

Dated: March 25, 2026

<div style="margin-left: 40%;">

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com
*Attorney for Plaintiff and Proposed Class*

</div>

# **CERTIFICATE OF SERVICE**

I, Andrew Roman Perrong, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

DATED this March 25, 2026.

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.