2026 WL 1746259
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

## MATT MCCORMICK, Plaintiff,

v.

## TEXAKOMA FINANCIAL, INC., Defendant.

Civil Action No. 4:25-cv-773
|
Filed 06/11/2026

**Editor's Note:** This document contains discussion of unverified citations, likely generated by AI tools used by a party or counsel. These citations are not attributable to the Court. The unverified citations have been preserved as part of the official record, but links are unavailable.

**Attorneys and Law Firms**

Amy Lynn Bennecoff Ginsburg, Ginsburg Law Group, P.C., Blue Bell, PA, for Plaintiff.

Barry Frank Cannaday, Dentons US LLP, Dallas, TX, for Defendant.

## ORDER SANCTIONING AMY L.B. GINSBURG

AMOS L. MAZZANT UNITED STATES DISTRICT JUDGE

**\*1** Courts have been flooded with cases involving fraudulent legal citations caused by reliance on generative artificial intelligence ("AI").[1] Regrettably, this is one of them. For the reasons herein, the Court will issue sanctions against Plaintiff's counsel, Amy L.B. Ginsburg.

## BACKGROUND

This is a Telephone Consumer Protection Act ("TCPA") case. Plaintiff alleges that Defendant called Plaintiff's personal phone number three times even though he registered it on the National Do Not Call Registry (Dkt. #1). On December 16, 2025, Defendant moved for summary judgment, arguing that the TCPA does not cover the calls at issue, that Plaintiff should be estopped from maintaining this lawsuit, and that an affirmative defense under the TCPA is conclusively established (Dkt. #17).

***The Fraudulent Filing***. On January 14, 2026, Plaintiff filed a response accompanied with a brief in support (Dkt. #21; Dkt. #21-1) (the "Motion for Summary Judgment Response"). Plaintiff's counsel, Amy L.B. Ginsburg ("Ginsburg"), signed it (Dkt. #21-1 at pp. 12, 13). Defendant filed a reply (Dkt. #22) (the "Reply"). In its "Introduction" section, the Reply drew attention to the fact that, among other issues, Ginsburg's Motion for Summary Judgment Response "cites a case that does not seem to exist" (Dkt. #22 at p. 4). The Reply also flagged fake quotes and unsupported propositions. Ginsburg did not file a sur-reply or move to remedy this problem.

***The Order to Show Cause***. After reviewing the veracity of Defendant's claim that Ginsburg submitted a brief with fraudulent citations, the Court issued an order to show cause on May 15, 2026 (Dkt. #23). The order identified the suspect citations and ordered Ginsburg to appear in person on May 28, 2026, at 10:00 a.m., to explain why she should not be sanctioned. The Court also ordered Ginsburg to bring highlighted copies of the cases she cited.

***The Response to the Order to Show Cause***. On May 28, 2026, less than one hour before the show cause hearing, Ginsburg filed a response to the order to show cause (Dkt. #24) (the "Order to Show Cause Response"). At the start of her Order to Show Cause Response, Ginsburg represented that she wanted "to explain how the filing occurred, correct the erroneous [fictitious] *Noviello* citation, and accept responsibility for the failure to verify the final version had been filed" (Dkt. #24 at p. 1). Whether Ginsburg's response accomplishes these goals will be the subject of further discussion below. *See infra* II. For now, the Court summarizes Ginsburg's explanation.

 **\*2** Ginsburg claims that a law clerk drafted the Motion for Summary Judgment Response. Allegedly, Ginsburg reviewed their draft. During her review, the *Noviello* case stood out to Ginsburg because her husband previously worked on a case with Noviello as the plaintiff and Ginsburg purportedly recognized the case name included the "incorrect Defendant" (Dkt. #24 at p. 3). Ginsburg assumed her "law clerk had difficulty in locating the correct case or cite but ... corrected the citation in [Ginsburg's] final version" (Dkt. #24 at p. 3). Ginsburg claims that, after the Court issued the order to show cause, she learned a paralegal had "selected an earlier draft from the file, added the date and certificate of service to that earlier draft, and when saving that modified version to our system and PDFing for filing, saved it as the final version" (Dkt. #24 at p. 3).

The Order to Show Cause Response includes the "correct" case, written by United States Magistrate Judge David Horan, but the case does not include the quotes attributed to it.

Ginsburg also attempted to explain the fact that the Reply identified the fictitious case, quotations, and propositions. Allegedly, during a team meeting, the only issue that came up was "that our case law was not on point, which is not unusual as attorneys typically differentiate [case law]" (Dkt. #24 at p. 4). Because Ginsburg held "the belief that [her] version had been filed," the team meeting about the Reply did not put Ginsburg on notice about the fraudulent filing (Dkt. #24 at p. 4). Ginsburg states that she "would agree that in the [Motion for Summary Judgment Response] erroneously filed it appears my law clerk did use AI to assist in drafting" (Dkt. #24 at p. 5). Ginsburg then requested leave to "locate or prepare a new version of the revised [Motion for Summary Judgment Response]" (Dkt. #24 at p. 5).

***The Show Cause Hearing***. At the hearing, Ginsburg represented that she could not know for certain whether AI was used to draft the Motion for Summary Judgment Response, because the law clerk or intern that drafted it is no longer with her law firm. She reiterated that the Reply did not put her on notice about the fictitious case, quotes, and propositions because the only topic that arose at a team meeting was that the cases in the Motion for Summary Judgment Response were allegedly not on point. She also claimed that she had recognized the fictitious case because her husband represented one of the named parties in the correct version of the case, and that she then corrected her version of the brief. When the Court explained that the quote in the Motion for Summary Judgment Response does not appear in the "correct" case, Ginsburg stated that she did not necessarily disagree, but that she would not submit fake quotes.

Furthermore, Ginsburg represented that her paralegal filed the wrong document. The Court asked Ginsburg if she was aware of the fact that other attorneys have tried to avoid sanctions with similar explanations in the past, and Ginsburg stated that she had no idea because she has worked on over 2,000 cases and this has never happened to her.

The Court then asked Ginsburg to explain the fake quotes attributed to real cases, observing that her Order to Show Cause Response focuses on the fake case. She agreed the quotes were fake but stated that the fake quotes did not appear on her revised draft of the Motion for Summary Judgment Response. The Court then asked Ginsburg if she reviewed the cases with unsupported propositions. Ginsburg said yes, stating that she did not necessarily rely on them but that she brought copies highlighting what the law clerk or intern may have been referring to.

Ginsburg acknowledged that submitting fictitious cases, quotes, and propositions is sanctionable under Rule 11 and the local rules. The Court asked Ginsburg what sanction would be appropriate under the circumstances, and Ginsburg stated that she did not know, because she has never been sanctioned before and has worked on thousands of cases without incident. The Court then asked Ginsburg whether she had anything else to share, and she expressed that she is extremely apologetic and that she would never knowingly submit fictitious citations.

**\*3**  The Court then asked defense counsel if he had a position on sanctions. Defense counsel explained that he incurred around $9,000 in attorney's fees preparing the Reply, which was more expensive than usual because defense counsel wanted to ensure he was not missing anything before accusing Ginsburg of relying on fictitious citations and unsupported propositions. Moreover, defense counsel explained that he spent around $2,000 to attend the show cause hearing. Based on these expenses, defense counsel suggested that attorney's fees would be an appropriate sanction.[2]

The Court then took the matter under advisement.

## LEGAL STANDARD

Federal Rule of Civil Procedure 11(b) provides in part that, in presenting to a court a written and signed pleading, motion, or other paper, an attorney "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." FED. R. CIV. P. 11(b)(2). Under Rule 11(b), an attorney who signs a legal document certifies that they have "read the document, ... conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both, and is acting without any improper motive." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991).

"If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." FED. R. CIV. P. 11(c)(1). Rule 11(c) further provides that "[a] sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." *Id.* 11(c)(4).

In determining whether an attorney has complied with Rule 11, the standard under which they are judged is "an objective, not subjective, standard of reasonableness." *Gauthier v. Goodyear Tire & Rubber Co.*, No. 1:23-CV-281, 2024 WL 4882651, at *2 (E.D. Tex. Nov. 25, 2024) (internal quotation marks omitted) (quoting *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 528 (5th Cir. 2016)).[3]

## ANALYSIS

The Court begins by identifying the erroneous citations included in the Motion for Summary Judgment Response. Then, the Court examines the veracity of Ginsburg's explanation and concludes that it is not credible. In the end, the Court imposes sanctions.

### I. The Citations

Ginsburg's Motion for Summary Judgment Response contains three categories of serious errors: a fictitious case, fictitious quotes, and unsupported propositions.

*Fictitious Case*. Instead of citing the fictitious case,[4] the Court includes a screenshot of the portion of the Motion for Summary Judgment Response that cites the case (Dkt. #21-1 at p. 12):

> **\*4** standing. In *Noviello v. Bayview Asset Management, LLC*, the court held that a plaintiff's financial motive for pursuing TCPA claims is "irrelevant to the question of liability," explaining that Congress expressly authorized statutory damages to incentivize private enforcement. No. 3:18-cv-02057, 2019 WL 13175252, at \*4 (N.D. Tex. Sept. 30, 2019). The court rejected arguments that

The Court attempted to locate the case and discovered that the case number leads to a different case from the Northern District of Texas without any opinions issued in 2019 (and no relationship to the TCPA). The Westlaw reporter number leads to a petition in a New Jersey personal injury case. Further detail regarding the case is unnecessary—Ginsburg concedes the case is fictitious. Her explanation for this error will be addressed below. *See infra* II.

*Fictitious Quotes*. Two fictitious quotes are attributed to a real case, *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001). The Motion for Summary Judgment Response includes the following quotations that do not appear in the case (Dkt. #21-1 at p. 11):

> In *Texas v. American Blastfax. Inc.*, the Western District of Texas held that the TCPA "places the burden of compliance squarely on the advertiser," rejecting defenses that would shift responsibility to the recipient of the call. 164 F. Supp. 2d 892, 899–900 (W.D. Tex. 2001). The

> non-delegable duties. In *American Biastfax*, the court rejected defenses that would undermine the TCPA's deterrent purpose, emphasizing that allowing such defenses would "eviscerate the statute." 164 F. Supp. 2d at 900. Permitting estoppel based on a consumer's silence would effectively

*Unsupported Propositions*. The unsupported[5] propositions from real cases are as follows:

Page Number 9 9 10 11 11 11 Case Cited (listed exactly as it appears in the Motion for Summary Judgment Response) *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) (affirmative defense fails where defendant cannot show procedures were effectively implemented). *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 899–900 (W.D. Tex. 2001) *Charvat v. GVN Mich., Inc.*, 561 F.3d 623, 630 (6th Cir. 2009) *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326–27 (5th Cir. 2008) *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 486 (Tex. 2017) *Gene & Gene*, 541 F.3d at 326. Court's Observations Case exists. **Proposition is not supported**. Ginsburg's proposition is that "Courts uniformly hold that the § 227(c)(5) defense requires evidence of actual compliance, not theoretical safeguards." But the page cited discusses the burden to show that common issues predominate in the context of certifying a class under a TCPA claim.[6] Case exists. **Proposition is not supported**. Ginsburg asserts that the "TCPA imposes strict liability," but the cited page numbers discuss whether defendants "willfully" violated the statute as the standard for liability, and the resulting damages for their non-compliance. Nowhere does the court hold that the TCPA imposes strict liability.[7] Case exists. **Proposition is not supported**. Ginsburg claims that "[w]hether procedures were applied with due care is a fact-intensive inquiry that turns on what Defendant actually did ...." But the case cited deals with TCPA damages through statutory interpretation and never discusses a fact-intensive inquiry or how to evaluate due care.[8] Case exists. **Proposition is not supported**. Ginsburg's proposition is that "the burden of proving consent or compliance lies with the defendant and cannot be shifted to the called party through implication, silence, or conduct," but the only "burden" the *Gene* court analyzes is the burden to prove the class certification requirements.[9] Case exists. **Proposition is not supported**. Ginsburg's proposition is that "[u]nder Texas law, silence can support estoppel only where there is a duty to speak," but the duty to speak is not mentioned in the case at all. The page cited discusses an estoppel argument in the context of a landlord-tenant issue.[10] Case exists. **Proposition is not supported**. The proposition is that a "party cannot claim detrimental reliance on a consumer's silence where the law already imposes an independent

duty to verify compliance." But the case does not discuss "reliance on a consumer's silence," or "an independent duty" to verify compliance.[11]

* * *

**\*5** In sum, Ginsburg's Motion for Summary Judgment Response contains a fictitious case, fictitious quotes attributable to real cases, and unsupported propositions.

## II. The Explanation

For the reasons below, the Court finds that Ginsburg's explanation for her errors is not credible. Therefore, even though Ginsburg claims she is taking ownership of her mistakes, the Court finds otherwise. In the Court's view, Ginsburg's story is a contrived attempt to shift the blame to others. Appropriate sanctions will therefore follow. *See infra* III.

### A. Ginsburg's alleged reaction to her intern or law clerk's initial draft does not survive scrutiny.

Under Ginsburg's version of events, she spotted the fictitious *Noviello v. Bayview* case when reviewing an earlier draft of the Motion for Summary Judgment Response. She was familiar with the matter because her husband represented a party in a prior case where Noviello was the plaintiff, and the "incorrect Defendant" name stood out to her (Dkt. #24 at p. 3). Ginsburg therefore "assumed [her] law clerk had difficulty in locating the correct case or cite" and then "corrected the citation in [her] final version" (Dkt. #24 at p. 3). As a reminder, to date, Ginsburg is unable to "locate" this final version (Dkt. #24 at p. 5).

At the show cause hearing, Ginsburg stated that she did not think the fictitious *Noviello v. Bayview* case was fake when she reviewed the earlier draft, because it was a motion in limine order that could be harder to cite and perhaps be more difficult to find on Lexis or Westlaw.[12] But if Ginsburg had performed a reasonable inquiry into the fictitious *Noviello v. Bayview*, she would have become aware of the fact that: (1) no case has this name; (2) the Westlaw reporter leads to a different case by a different court; and (3) the case number leads to a different case from a different year. In other words, she would become aware that someone included a fictitious case in a draft that was supposedly ready for her review. And under her version of events, when "correct[ing] the citation," she would presumably notice that the quote for which *Noviello v. Bayview* is cited does not appear in the "correct" *Noviello* case.[13] Put differently, Ginsburg would become aware that her intern or law clerk included fake quotes in the brief. If someone—even an intern—gets the case name, number, year, and quotation wrong, they are not struggling with research or citation formatting. They are struggling with honesty. Ginsburg's representations, at best, lack credibility.

**\*6** Not only that, but if Ginsburg had verified every citation like she claimed at the show cause hearing, she would have also learned that her intern or law clerk attributed fake quotes to the real *Blastfax* case.[14] Under these circumstances, no reasonable attorney, particularly after the advent of AI, would conclude that the intern or law clerk was merely having "difficulty in locating the correct case or cite" (Dkt. #24 at p. 3). The Court especially doubts that Ginsburg would reach that conclusion, given her experience with "numerous CLEs on the use of AI" (Dkt. #24 at p. 4).[15]

The "correct case or cite" phrase is itself suspect. These are not interchangeable details. If Ginsburg discovered that someone at her law firm tried to pass off a fictitious *case* as a real one, that would warrant a substantially different reaction than discovering, say, a typo in the Westlaw reporter number (i.e., discovering an incorrect *cite*). Ginsburg's equivocal language is concerning.

In sum, Ginsburg's explanation has problems from the start. The Court does not believe Ginsburg's representation that she assumed her intern or law clerk was merely having difficulty locating the correct case or citation after she reviewed their draft.

### B. Ginsburg's "wrong version" explanation does not survive scrutiny.

For Ginsburg's story to be true, two people other than herself must have committed critical mistakes: the intern or law clerk who drafted a brief with serious errors, and the paralegal who "selected an earlier draft from the file, added the date and certificate of service to that earlier draft, and when saving that modified version ... for filing, saved it as the final version" (Dkt. #24 at p. 3). Ginsburg says that the "paralegal suggested it may have been written over when she saved the filed version as the final version" (Dkt. #24 at p. 5). The Court does not believe this either.

At the show cause hearing, Ginsburg stated that it was not her practice to save files under different version names, such as version one and version two. Yet her Order to Show Cause Response indicates that there were multiple drafts from which the paralegal could "select[ ]" (Dkt. #24 at p. 3). If there were multiple drafts to select from, it is unclear why saving one of the files would "writ[e] over" a different file (Dkt. #24 at p. 5).[16] Maybe it is Ginsburg's practice to have her paralegal *delete* older drafts once a final version is filed, but that is not what Ginsburg claims. If Ginsburg's practice is to have a single draft without multiple versions, it is not clear why the problematic citations would remain in the draft after Ginsburg supposedly revised it (and if only one draft existed, it would be misleading and sanctionable to claim that the paralegal "selected an earlier draft").

 **\*7**  Furthermore, to date, Ginsburg has not presented any "[revised] draft, metadata, or any other evidence to support [her] excuse." *R-Mart Trailers*, No. 5:24-cv-87-RWS, Docket No. 59 at 6. Under these circumstances, the Court does not believe Ginsburg's explanation that the wrong version of a corrected brief was filed.

### C. Ginsburg's generic assertions and equivocal statements cast further doubt on her explanation.

Ginsburg's explanation has other problems that lead the Court to doubt that she is truly taking ownership of her mistakes.

In the opening paragraph of Ginsburg's Order to Show Cause Response, filed under an hour before the show cause hearing, Ginsburg stated that she submits "this response to explain how the filing occurred, correct the erroneous [fictitious] *Noviello* citation, and accept responsibility for the failure to verify the final version had been filed" (Dkt. #24 at p. 1).

The fictitious *Noviello* citation is the most egregious error in Ginsburg's filing, but it is hardly the only error warranting "correct[ion]." For example, Ginsburg's signature is on a brief that attributes fictitious quotes to the *Blastfax* case. Ginsburg's Order to Show Cause Response does not mention this. When the Court raised this issue during the hearing, Ginsburg stated that she did not rely on any fictitious quotes in her revised draft. If Ginsburg's story is that she spotted the fake *Blastfax* quotes during her review of the "earlier draft," then, again, it strains credulity for Ginsburg to claim that she merely thought her intern or law clerk was struggling to locate or cite cases. Ginsburg's Order to Show Cause Response only specifically identifies a single citation that she fixed (Dkt. #24 at p. 3 ("[W]hen reviewing and revising the brief, I had taken note of *this* incorrect cite and assumed my law clerk had difficulty in locating the correct *case* or *cite* but regardless corrected *the citation* in my final version" (emphasis added))).

When Ginsburg does refer to multiple citations, she does so generically, while using terms that minimize her predicament. In the introduction to her Order to Show Cause Response, for example, Ginsburg states that she "respectfully acknowledge[s] that the [Motion for Summary Judgment Response] ... included citations and parentheticals that should have been drafted with greater precision" (Dkt. #24 at p. 1). But Ginsburg's signature is on a court filing containing, at the very least, a fictitious case and fictitious quotes. Ginsburg had almost two weeks to draft her Order to Show Cause Response (and submitted it less than an hour before the show cause hearing), so the Court assumes Ginsburg had ample time to choose her words carefully. Characterizing this as a case needing "greater precision" was the wrong choice.

Furthermore, when confronted with the simple and undeniable fact that the "correct" *Noviello* case does not include the quote attributed to it, Ginsburg stated she did not necessarily disagree. Whether the quote exists or not is a straightforward issue. Because the existence of the "correct" *Noviello* case is the only piece of evidence Ginsburg puts forth to corroborate her story, she should have been prepared to directly answer questions about its contents.

Also, when asked if she brought copies of the cases with highlights on the text supporting the propositions in her Motion for Summary Judgment Response, Ginsburg stated that she did not necessarily rely on the cases but that she highlighted the provisions she believes the law clerk or intern may have been referring to. Again, whether she relied on the cases or not is a straightforward issue. If Ginsburg believes the propositions are supported, she should have stood by them. If she determined the propositions were unsupported, she should have left the cases blank, because the Court ordered her to "highlight[ ] the text that supports the propositions," not to highlight what she thinks someone else might think supports them (Dkt. #23 at p. 2).

\* \* \*

**\*8**  Ginsburg claims that she is taking ownership of her mistakes, but her actions say otherwise. Rather than owning up to her ethical violations, Ginsburg came forward with a half-baked, last-minute story that shifts the blame to everyone but herself and raises more questions than answers. The Court does not believe it. Instead, the Court finds Ginsburg's narrative was a failed attempt to avoid responsibility.

### III. The Court's Sanctions

Ginsburg's signature appears on a document stained by a fictitious case, fictitious quotes, and unsupported propositions, so she will be sanctioned. *See, e.g., Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 461 (S.D.N.Y. 2023) ("A fake opinion is not 'existing law' and citation to a fake opinion does not provide a non-frivolous ground for extending, modifying, or reversing existing law, or for establishing new law."); *Safe Choice, LLC v. City of Cleveland*, No. 1:24-CV-02033-PAB, 2025 WL 2958211, at \*4 (N.D. Ohio Oct. 17, 2025) ("[A]s it always has, misrepresenting the holdings of case law violates Rule 11."). The remaining question is what the sanctions should be.

Because Ginsburg has not accepted responsibility despite claiming to do so, *see supra* II, the Court finds that a reprimand alone would be an insufficient sanction. *See Fletcher*, 168 F.4th at 240 (acknowledging that a reprimand may be an appropriate sanction if, among other things, the attorney recognizes their misconduct).[17]

Nor are financial sanctions sufficient to deter similar misconduct. In a February 18, 2026 opinion, the Fifth Circuit cited a database identifying "239 cases of hallucinations by lawyers in the United States." *Id.* at 234 (citing *AI Hallucination Cases*, Damien Charlotin, https://www.damiencharlotin.com/hallucinations [hereinafter *AI Hallucinations*]). As of June 11, 2026, that figure has increased to 434. *AI Hallucinations.* Despite the frequency of these incidents, "attorneys have not been sufficiently deterred by financial sanctions imposed to date." *Parker v. Costco Wholesale Corp.*, No. C25-0519-SKV, 2025 WL 4228413, at \*9 (W.D. Wash. Nov. 7, 2025). "As a practical matter, time is telling us—quickly and loudly—that [reprimands and modest fines] are insufficient deterrents." *Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1246 (N.D. Ala. 2025).

Because a sanction under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," FED. R. CIV. P. 11(c)(4), the Court concludes that the consequences for Ginsburg must be more than financial. The "seriousness of filing fictitious case citations—and the corresponding waste of judicial and party resources—warrants a penalty sufficient to deter future violations." *Elizondo v. City of Laredo*, No. 5:25-CV-50, 2025 WL 2071072, at \*3 (S.D. Tex. July 23, 2025).

**\*9**  The Court takes no joy in issuing sanctions, but deterring misconduct from those similarly situated "will, necessarily and unfortunately, involve moving beyond admonitions and reprimands into more punitive sanctions. Until attorneys reliably verify the accuracy of AI-generated materials, courts must take the steps necessary to safeguard the integrity of the judicial process." *Fivehouse v. U.S. Dep't of Def.*, No. 2:25-CV-00041-M, 2026 WL 1278575, at \*10 (E.D.N.C. May 7, 2026). The Court will sanction Amy L.B. Ginsburg accordingly.[18]

**CONCLUSION**

After considering the record, the veracity of Ginsburg's explanation, and the arguments presented, the Court finds that the following combination of monetary and non-monetary sanctions are the least severe sanctions sufficient to deter similar misconduct:

The Court **PUBLICLY REPRIMANDS** Amy L.B. Ginsburg for the misconduct described in this Order.

It is hereby **ORDERED** that the Clerk of the Court shall serve a copy of this Order on all the district judges and magistrate judges in this district.

Ginsburg is **ORDERED** to conduct a reasonable review of every filing bearing Ginsburg's signature filed between January 1, 2026, and the date of this Order in any federal or state court. As part of that review, Ginsburg shall verify the existence and accuracy of every legal authority cited in those filings, including case citations, quotations, parentheticals, statutory citations, regulatory citations, and citations to secondary authorities. If her review reveals any citation to a non-existent authority or any other material misrepresentation concerning a cited authority, Ginsburg shall notify the affected court and parties in the relevant matter and take appropriate steps to correct the record within **three days** of discovering such misrepresentation. No later than **ninety days** from the date of this Order, Ginsburg shall file with this Court a sworn certification stating that she completed the required review, identifying any misrepresentations discovered and the corrective actions taken. The sworn certification shall include a list of all filings that Ginsburg reviews.

It is further **ORDERED** that any motion for sanctions by Defendant requesting an award of attorney's fees must be filed within **fourteen days** of the date of this Order. Counsel for both parties is further **ORDERED** to meet and confer regarding: (1) whether opposition to any motion for sanctions is warranted in light of the Court's findings herein; and (2) the reasonable necessity of the attorney's fees incurred in discovering and exposing the fictitious citations, quotations, and unsupported propositions in Ginsburg's Motion for Summary Judgment Response. Defendant shall not seek to recover expenses incurred in filing those aspects of its motion papers that did not relate to discovering and exposing the fictitious citations, quotations, and unsupported propositions in Ginsburg's Motion for Summary Judgment Response.

Ginsburg is further **ORDERED** to pay a $5,000 penalty into the registry of this Court within **fourteen days** of the date of this Order. Ginsburg and her law firm are jointly responsible.

It is further **ORDERED** that Plaintiff's Response in Opposition to Defendant Texakoma Financial, Inc.'s Motion for Summary Judgment (Dkt. #21) is hereby **STRICKEN**.

 **\*10**  It is further **ORDERED** that any corrected response to Defendant's motion for summary judgment must be filed within **five days** of the date of this Order.

It is further **ORDERED** that, to effectuate the Court's reprimand, the Clerk of the Court is **DIRECTED** to submit this Order for publication in the Federal Supplement.

Ginsburg is further **ORDERED** to serve a copy of this Order on Plaintiff and file a Notice of Proof of Compliance with the Court within **three days** of the date of this Order.

Ginsburg is further **ORDERED** to attend Continuing Legal Education course(s) of at least two hours regarding the ethical use of artificial intelligence in the practice of law, the topic of candor to the court, and/or similar topics, and Ginsburg shall file a Notice of Proof of Compliance within **thirty days** of the date of this Order.

It is further **ORDERED** that, for **one year** after the date of this Order, Ginsburg must include a signed Certification of Verification at the end of any future filings that cite any legal authorities in all cases before this Court, which must state the following:

> I, Amy L.B. Ginsburg, certify that I personally reviewed each citation and authority referenced in this filing and that, to the best of my knowledge and belief, all citations are genuine and accurately reflect the law as of the date of filing. I also certify that I personally verified that the file I reviewed is the same one that is being submitted to this Court.

**IT IS SO ORDERED.**

**SIGNED this 11th day of June, 2026.**

**All Citations**

--- F.Supp.3d ----, 2026 WL 1746259

Footnotes

1    *See, e.g., Fletcher v. Experian Info. Sols., Inc.*, 168 F.4th 231, 234 (5th Cir. 2026) ("[D]espite numerous news stories, CLE presentations, scholarly articles, and judicial entreaties, AI-hallucinated case citations have increasingly become an even greater problem in our courts, and the problem shows no sign of abating."); *Kettering Adventist Healthcare v. Collier*, No. 3:25-CV-273, 2026 WL 523117, at *3 (S.D. Ohio Feb. 25, 2026) ("[T]he problem of attorneys submitting hallucinated citations is rapidly worsening, and is one of the biggest threats currently facing federal civil litigation."); *Sanders v. United States*, 176 Fed. Cl. 163, 169 (2025) ("It is no secret that generative AI programs are known to 'hallucinate' nonexistent cases, and with the advent of AI, courts have seen a rash of cases in which both counsel and *pro se* litigants have cited such fake, hallucinated cases in their briefs.").

2    "Attorneys' fees paid to another party are not a valid sua sponte sanction under ... Rule [11]." *Brunig v. Clark*, 560 F.3d 292, 298 (5th Cir. 2009); FED. R. CIV. P. 11(c)(4). At this stage, the Court will not award them.

3    Moreover, the local rules for the Eastern District of Texas specifically address a lawyer's obligations when using AI, and caution that "[i]f a lawyer chooses to employ generative artificial intelligence technology in representing a client, the lawyer continues to be bound by the requirements of Federal Rule of Civil Procedure 11, Local Rule AT-3, and all other applicable standards of practice and must review and verify all content." LOCAL RULE AT-3(m).

4    Because the Westlaw reporter number and the case number both connect to real cases, the Court will avoid perpetuating the error of attributing those numbers to the fictitious case Ginsburg cited.

5    The Court excludes citations with imprecise pincites as well as any propositions that the Court found arguably supported. During the show cause hearing, Ginsburg stated she did not necessarily rely on these cases. In the event that she did, the Court explains why it found the propositions listed herein to be unsupported.

6    Ginsburg's highlights in the *Gene* case, which she claims represent what her law clerk or intern may have been referring to, do not alleviate the Court's concerns about reliance on AI. *Gene* in no way analyzes when the safe harbor "affirmative defense fails," but instead discusses the role of affirmative defenses in the predominance inquiry for class certification. The Court therefore agrees with Defendant that the proposition is unsupported.

7    Ginsburg's highlights, again, do little to alleviate the Court's concerns about improper reliance on AI. One of her highlights is the portion of *Blastfax* that explains that TCPA liability does not require "bad faith, but only that the person have reason to know, or should have known, that his conduct would violate the statute." The distinction between a strict liability standard and a willfulness standard that requires that a person "know" or "should have known" something is self-evident. The Court agrees with Defendant that the proposition is not supported.

Ginsburg highlights the portion of this case that quotes the safe harbor statute, which does not itself discuss whether the safe harbor defense is fact intensive. The Court agrees with Defendant that the proposition is unsupported.

Ginsburg's highlights do not support the proposition. The parties in *Gene* debated whether consent is an affirmative defense or part of a plaintiff's claim, but the *Gene* court deemed that issue "irrelevant to [its] analysis" because both affirmative defenses and elements of a claim can bear on the predominance inquiry for class certification. The Court agrees with Defendant that the proposition is unsupported.

Ginsburg highlights the portion of *Shields* setting forth the elements of equitable estoppel. The list of elements makes no mention of a duty to speak. The Court agrees with Defendant that the proposition is not supported.

Ginsburg highlights portions of page 324 and 327, but the Court cannot discern a connection between the highlighted portions and the proposition. Thus, the Court agrees with Defendant that the proposition is unsupported.

Judge Horan's motion in limine order is on Westlaw and Lexis, and it can be cited like any other case. See *Noviello v. Holloway Funding Grp.*, No. 3:22-CV-52-BN, 2023 WL 2195768, at *1 (N.D. Tex. Feb. 23, 2023), and *Noviello v. Holloway Funding Grp.*, No. 3:22-cv-52-BN, 2023 U.S. Dist. LEXIS 30591, at *1 (N.D. Tex. Feb. 23, 2023). The Court does not see, nor did Ginsburg explain, why Judge Horan's order would be cited differently just because it resolved a motion in limine.

It goes without saying that if Ginsburg corrected only the "case or cite" without verifying the quote exists, that would not help her avoid sanctions. Especially because, if this is what happened, Ginsburg was not forthcoming about it. Instead, she denied including any fake quotes in her revised version.

Ginsburg does not specifically address the fake quotes attributed to *Blastfax* in her Order to Show Cause Response. Instead, Ginsburg makes generic assertions that undermine her credibility, as explained further below. *See infra* II.C.

Ginsburg's experience with AI-related courses also leads the Court to be skeptical of her other positions at the hearing. When asked if she is aware that other lawyers have tried to avoid sanctions by arguing they filed the wrong brief, *see, e.g., R-Mart Trailers LLC v. MP Custom Trailers LLC*, No. 5:24-CV-87-RWS, Docket No. 59 at 2 (E.D. Tex. July 17, 2025); *Coomer v. Lindell*, No. 22-CV-01129-NYW-SBP, 2026 WL 1256553, at *1 (D. Colo. May 7, 2026), Ginsburg stated that she has no idea because she has been practicing over 20 years and handled over 2,000 cases in federal court without experiencing anything like this. When asked what she believes would be an appropriate sanction, Ginsburg stated that this question is completely out of her wheelhouse because she has never been sanctioned. The Court doubts that Ginsburg is totally uninformed about the types of sanctions courts have deemed appropriate in cases containing fake cases, quotes, or propositions.

To be clear, Ginsburg's Order to Show Cause Response does not assert that the file *was* written over, but that the paralegal suggested it was. At the hearing, Ginsburg used similar language, claiming that her paralegal *believes* the revised draft was overwritten.

Because Rule 11 sanctions serve to deter future misconduct by others, federal courts have issued creative non-monetary sanctions even when an attorney earnestly accepts responsibility. *See, e.g., Lifetime Well LLC v. IBSpot.com Inc.*, 819 F. Supp. 3d 373, 389 (E.D. Pa. 2026) (ordering attorney that "accepted responsibility" to "send a cover letter to the President of the Philadelphia Intellectual Property Lawyers Association enclosing today's Order, this Memorandum ... and respectfully advise the President of our request these attachments be shared with the Association's membership during its next Association membership meeting as a lesson on the risks of artificial intelligence").

There is no evidence suggesting that Plaintiff was aware of Ginsburg's conduct, so he will not be sanctioned. To avoid prejudicing Ginsburg's client for her misconduct, the Court will also allow a corrected response to be filed.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.